UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x
KEITH EDWARDS,

                Petitioner,

                                          **MEMORANDUM & ORDER**

      -against-

                                            13 CV 2648 (RJD)

PAUL CHAPPIUS,

                Respondent.
-----------------------------------------------------x
DEARIE, District Judge.

Before the Court is petitioner Keith Edwards's application for a writ of habeas corpus pursuant to 28 U.S.C. §2254. Petitioner was convicted in 2006, after a jury trial at which he testified in Supreme Court, Queens County, of first-degree assault, NY Penal Law ("PL") §120.10(1)), and criminal possession of a weapon in the fourth degree, PL §265.01(2). Based on petitioner's criminal history the court found him to be a persistent violent felony offender and imposed the statutory minimum sentence of 20 years to life. PL §70.08(3)(a-1).[1] Petitioner remains incarcerated.

The charges arise out of a physical altercation between petitioner and his victim, Claudio

---

[1] At the pre-sentence conference, see C.P.L. § 400.10, petitioner admitted the two first-degree robbery convictions listed in the prosecution's mandatory persistent violent felony notice. ECF Doc. 5-5 at 323. Petitioner then submitted additional materials in mitigation addressing his life circumstances. At sentencing, the court stated that it had "extensively reviewed" those materials and was "aware of [petitioner's] prior history . . . [and] the various factors that [a]ffected his life" including alcohol and substance abuse, but also remarked that petitioner had been convicted of a total of 4 felonies and arrested at least 7 times. S: 8-9, ECF Doc. 5-5 at 339-40. Petitioner later challenged the persistent violent felon finding in a post-conviction motion to set aside his sentence, which the court denied by order dated May 10, 2012. ECF Doc. 1 at 20-22. The Appellate Division denied leave to appeal that order. Id. at 23. Petitioner does not challenge his sentence here.

Urena, in the lobby of a Queens apartment house in 2005. Urena testified that petitioner thrust the handle of a screwdriver into his left eye, causing substantial damage, including a detached cornea and hemorrhaging that required two surgeries to repair. Urena's medical records and testimony from the ophthalmologist who treated him corroborated the severity of the injury. A year later, at trial, Urena could see only light out of the injured eye. Petitioner, by contrast, testified that he did not have a screwdriver, that Urena struck him first, that he punched back but only with his fist, and that he encountered Urena the following day on the street—the same time that Urena was, in fact, in surgery—and saw nothing wrong with Urena's eye.

In his application for habeas relief petitioner claims that his appellate attorney was ineffective in two principal ways. First, he complains that the attorney raised only a single appellate issue—a challenge to the adequacy of the trial court's admonishments to the jury before recess—that was both unpreserved and meritless, while he declined to pursue viable sufficiency challenges to both counts of conviction. Second, petitioner faults appellate counsel for failing to assert that trial counsel was ineffective because she failed, *inter alia*, to (i) cross-examine the ophthalmologist adequately, (ii) call an alternative ophthalmology expert to rebut the state's witness, or (iii) move to dismiss the weapon charge on sufficiency grounds. Petitioner advanced these claims in a pair of motions for *coram nobis* relief in state court. The Appellate Division summarily denied both applications under federal and state standards, concluding in each case that petitioner "failed to establish that he was denied the effective assistance of appellate counsel." People v. Edwards, 88 A.D.3d 902, 902 (2d Dep't 2011) (citing, *inter alia*, Jones v. Barnes, 463 U.S. 745 (1983)), lv. app. denied, 18 N.Y.3d 957 (2012); People v. Edwards, 98 A.D.3d 681, 681 (2d Dep't 2012) (same), lv. app. denied, 20 N.Y.3d 1098 (2013). Respondent agrees that the claims are exhausted.

As discussed below, petitioner has not met the formidable standards required to disturb these state court rulings. Accordingly, the application for a writ of habeas corpus is denied and the petition is dismissed.

## PERTINENT TRIAL TESTIMONY

At trial, Urena testified, in pertinent part, that shortly after 6 a.m. on September 24, 2005, he was heading back to his girlfriend's apartment when petitioner approached him, in a parking lot, and asked him for money. T: 621. Urena told him he "didn't have anything" and kept walking. T: 621. Petitioner "continued to walk with" him until he got to the elevator and "kept asking for money." T: 622. Urena told him, "I can't be dealing with this right now. I have too many problems." Id. "Then," according to Urena, petitioner "took a screwdriver out" that "he had hidden [ ] inside his pants" and threatened to kill Urena if he didn't give him money. T: 622. The screwdriver was "at least two-and-a-half, 3 feet long." T: 627. After Urena demonstrated with his hands, the court noted, "[i]ndicating about a foot and a half, sixteen inches" T: 627.

Urena pressed the elevator button, the door opened, he stepped in and petitioner followed, blocking the door from closing. T: 624. Urena offered petitioner two dollars, "then [petitioner] turned around and punched [Urena] in the face," causing his eyeglasses to fall off. T: 628-29. Reaching for his glasses, Urena kept petitioner at bay by holding the blade of the screwdriver. (He stated on cross examination that this action did not cause him to suffer any cuts to his hands.) "Then [petitioner] banged [Urena] with the green handle of the screwdriver . . . and scraped [his] eye out." T: 629. Urena was bleeding and could not see out of his left eye. T: 631. Urena did not strike petitioner first, or at all. Then petitioner "just finally left" and Urena went upstairs to his girlfriend's apartment. T: 629-31.

Urena did not seek medical treatment until the next day.[2] He underwent two surgeries: one "to fix [his] ruptured glob[e]" and the other "to remove fluid from the eye." T: 633. At trial, he "published" the injured eye to the jury by removing his glasses and walking toward the jury box. T: 633. He testified that he still "can't see" out of his eye. T: 634. Asked if he could "see anything," he replied, "[j]ust light." T. 634. He also stated that he was still in need of cornea replacement surgery. T: 633.

Urena acknowledged that when he first arrived at the hospital he said that petitioner punched him in the eye with a closed fist and added: "[i]t was the screwdriver…If he [had only] punched me in the face, we wouldn't be here right now." T: 637, 641-42, 656, 663, 654.

Dr. Joseph Fishkin, the ophthalmologist who examined Urena at the Peninsula General Hospital ER, testified that he diagnosed Urena as having a "ruptured globe," *i.e.*, a "traumatic detachment of the cornea graft," T: 724-25. He explained: "[t]he bottom of the cornea was totally ripped open," which "allowed a hole . . . going into the eye." T. 723. The iris "was sticking out through that hole" and "other contents of the eye were passing through the hole as well." There was "no visible lens in the eye at all." T. 723. Urena had "hands only vision," which meant he could see only the general shadow of hands moving before his eyes but could not read the eye chart. T: 722. Fishkin explained that "[d]ue to the massive injury in the front of the eye, [he] was unable . . . to examine further . . . to explore" the back of the eye. T: 723. Fishkin placed a shield on the eye and had Urena transferred to New York Eye and Ear Infirmary where he had surgery that day. The "contents that had left the eye" were "partially remove[d]"

---

[2] Urena's girlfriend testified that the following morning she called the police who in turn called for an ambulance.

4

and "partially replace[d]," and the "edge of the cornea" was "seal[ed] closed." T. 725. Approximately ten days later, after Urena had "massive bleeding hemorrhage inside the eye itself," a second surgery was performed "to clear out the bleeding from inside the eye" and "to help stabilize his retina in the back of the eye." T: 725-6.[3]

The court also qualified Dr. Fishkin, without objection, as "an expert in the area of eye care and treatment." T: 717. In that capacity, he testified that, in his opinion, "it is very unlikely that [Urena's] injury is due to a punch in the eye," which is something he sees often and "results in less[] severe types" of eye injury that Urena suffered, typically abrasions and possible fractures of bones around the eye. T: 727, 729. Fishkin explained that a man's fist was too large to get past the bones around the eye and cause the injury Urena suffered. T: 728-29. Based on Fishkin's observation and Urena's medical records, there was no damage to the bones around Urena's eye, although "there was mention [in the records] of one of the nasal bones being broken." T. 729

Fishkin believed that "[a] blunt instrument . . . can" cause the type of injury Urena suffered, and that Urena's injury was likely caused either by "trauma with some object that is small enough to fit through th[e] bones" around the eye, or "a very very high rate of force or speed" as in a car accident. T: 731-32. Fishkin confirmed that the admitted medical records indicated that Urena had had cornea transplant surgery 20 years earlier, but that fact did not alter his opinion about the likely cause of Urena's eye injury. T: 734.

Defense counsel's brief cross, spanning less than four full transcript pages, elicited that a

---

[3] In preparation for testifying about the surgeries, Dr. Fishkin reviewed Urena's medical records from New York Eye and Ear, which were also admitted.

5

"fist" is a "blunt instrument," but that Fishkin would not equate the speed of a fist to that of a car, and that in Fishkin's opinion a fist could not have caused Urena's injury. T: 737-38.[4]

Petitioner, for his part, denied having a screwdriver. T: 788. He admitted that he "punched" Urena "in the face," but insisted that Urena struck him first. T: 787.[5] Urena had just carried out a jointly-funded drug purchase and struck petitioner after petitioner accused him of not dividing the purchased drugs evenly. The pair "exchanged blows" and "[a]fter that, the fight ended abruptly" and petitioner left. T: 788.

Petitioner further testified that he saw Urena the day after the incident, that they shook hands, and that Urena had no visible injuries. T: 877. Asked to clarify, petitioner said that his encounter with Urena "[a]bsolutely" occurred the morning after the altercation. T: 878. He added: "And [I] look him in his eye at that point. This is where I boggled [sic]. I look him right in his face, and I s[aw] nothing wrong with him.... Nothing. No swelling. No eye injuries. Nothing." T: 879.

## GENERAL HABEAS STANDARDS

**Threshold Requirements: Constitutional Nature of Claim,
Procedural Integrity (Exhaustion, "Independent and
Adequate State Law" Doctrine, and Related Procedural Concerns)**

First and foremost, "federal habeas corpus relief does not lie for errors of state law." Lewis v. Jeffers, 497 U.S. 764, 780 (1990). Rather, "28 U.S.C. §2254 allows a court to entertain a habeas petition 'only on the ground that [an individual] is in custody in violation of the

---

[4] In summation, counsel argued that "it's more plausible to believe that Mr. Urena was poked in the eye by his glasses when he was struck in the face with a fist," T: 917, but did not broach this line of questioning with Fishkin.

[5] The court instructed the jury on the defense of justification. T: 993-95.

6

*Constitution or laws or treaties of the United States.*'" Garner v. Lee, 908 F.3d 845, 860 (2d Cir. 2018) (emphasis added) (quoting, 28 U.S.C. § 2254(a)).

Second, before bringing bona fide federal claims to the habeas court, the petitioner must first exhaust those claims by fully and fairly presenting the substance of each to the highest state court. See 28 U.S.C.§ 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State."); Picard v. Connor, 404 U.S. 270, 275 (1971) ("federal habeas corpus statute . . . embodies the long-established principle that a state prisoner seeking federal habeas review of his conviction ordinarily must first exhaust available state remedies"); Daye v. Attorney Gen. of State of New York, 696 F.2d 186, 191 (2d Cir. 1982) ("In order to have fairly presented his federal claim to the state courts, the petitioner must have informed the state court of both the factual and the legal premises of the claim he asserts in federal court").

The habeas statute also recognizes that where "there is an absence of available State corrective process" or "circumstances that render such process ineffective to protect the [petitioner's] rights," the exhaustion requirement may be waived. 28 U.S.C. §2254(b)(1)(B). The statute also provides that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2).

**Substantive Review Standards**

The current habeas statute provides in relevant part as follows:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the

7

adjudication of the claim ... resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(1), as amended by the Antiterrorism and Death Penalty Act of 1996 ("AEDPA").

The Supreme Court has repeatedly explained that this statute "erects a formidable barrier to federal habeas relief," Burt v. Titlow, 571 U.S. 12, 19 (2013), because it embodies "a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights ... and are thus presumptively competent [ ] to adjudicate claims arising under the laws of the United States." Id. at 19. Indeed, federal habeas courts "will not lightly conclude that a State's criminal justice system has experienced the extreme malfunction for which federal habeas relief is the remedy." Id. at 16 (internal quotations, citations and alterations omitted). See also Virginia v. Le Blanc, 137 S.Ct. 1726, 1728 (2017) ("In order for a state court's decision to be an unreasonable application of this Court's case law, the ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice") (internal quotation marks and citations omitted); Renico v. Lett, 559 U.S. 766, 773 (2010) ("AEDPA [ ] imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt") (internal quotations omitted). But see Brumfield v. Cain, 135 S. Ct. 2269, 2277 (2015) ("As we have also observed, however, even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review, and does not by definition preclude relief.") (internal quotation marks, citation and alterations omitted).

As the Supreme Court has recently reiterated:

> The federal habeas statute ... imposes important limitations on the power of federal courts to overturn the judgments of state courts in criminal cases. The statute respects the authority and ability of state courts and their dedication to the

protection of constitutional rights. Thus, under the statutory provision at issue here, 28 U.S.C. §2254(d)(1), habeas relief may be granted only if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of," Supreme Court precedent that was "clearly established" at the time of the adjudication. ... This means that a state court's ruling must be so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Shoop v. Hill, 139 S.Ct. 504, 506–07 (2019) (internal quotations and citations omitted). Accord Orlando v. Nassau Cty. Dist. Attorney's Office, 915 F.3d 113, 121 (2d Cir. 2019) ("unreasonable application" standard of § 2254(d)(1) is a "bar [that] is not reached where fairminded jurists could disagree on the correctness of the state court's decision") (internal quotation and citation omitted). In short, "[i]f this standard is difficult to meet—and it is—that is because it was meant to be." Burt, 571 U.S. at 20 (internal quotations, citations and alterations omitted).

Alternatively, under the less frequently invoked second branch of § 2254(d), a petitioner may seek habeas relief by challenging the factual basis of the adverse state court ruling. See 28 U.S.C. §2254(d)(2) (habeas court may overturn the state court's decision only if it was "based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceedings." Id. A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. 290, 301 (2010). Further, 28 U.S.C. § 2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and that the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."[6]

---

[6] The Supreme Court and the Second Circuit have declined to address the relationship between §2254(d)(2) and §2254 (e)(1). See Brumfield, 135 S.Ct. at 2282 ("We have not yet defined the

9

# STANDARDS: INEFFECTICVE ASSISTANCE OF APPEALLATE COUNSEL

Claims that appellate counsel was ineffective are governed by the familiar two-prong test announced in Strickland v. Washington, 466 U.S. 668 (1984). See Smith v. Robbins, 528 U.S. 259, 285-86 (2000) (Strickland is proper standard to apply to claims of ineffective assistance of appellate counsel); Pignataro v. Poole, 381 F. App'x 46, 48 (2d Cir. 2010) (same), cert. denied, 562 U.S. 1184 (2011). Under Strickland, to show that he was denied his Sixth Amendment right to the effective assistance of counsel, petitioner bears the burden of showing, first, that "counsel's representation fell below an objective standard of reasonableness," Strickland, 466 U.S. at 688, and second, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

On the deficiency prong, "the[ ] inquiry must be whether counsel's assistance was reasonable considering all the circumstances." Id. at 688. The "court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct" and "must [ ] determine whether the [challenged actions or decisions] were outside the wide range of professionally competent assistance." Id. at 690. In the appellate context, Strickland deference on the deficiency inquiry means that attorneys "need not (and should not) raise every non-frivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." Smith, 528 U.S. at 288; see also Jones v. Barnes, 463 U.S. 745, 751 (1983) (appellate counsel not required "to press nonfrivolous points, ... if counsel, as a matter of professional

---

precise relationship between § 2254(d)(2) and § 2254(e)(1)") (internal quotation and citation omitted); Garguilio v. Heath, 586 F. App'x 764, 766 n. 1 (2d Cir. 2014).

judgment, decides not to present [them]"). "Appellate counsel is not required to raise every nonfrivolous argument on appeal," id., but "omit[ing] significant and obvious issues while pursuing issues that were clearly and significantly weaker" can be ineffective assistance. Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).

Strickland's actual-prejudice prong applies to claims of ineffective assistance of appellate counsel. Robbins, 528 U.S. at 286. To demonstrate prejudice in the appellate context, a petitioner must show "a reasonable probability that, but for [the challenged deficiency of appellate counsel], he would have prevailed on his appeal." Id. at 285. Accord, Pignataro, 381 F. App'x at 48 (to show Strickland prejudice in the appellate context, "petitioner must show that 'there was a reasonable probability that [his] claim would have been successful before the [state's highest court]'") (quoting, Mayo v. Henderson, 13 F.3d 528, 534 (2d Cir. 1994)).

Further, to prevail ineffectiveness claims *that the state court has rejected on the merits*, a petitioner must show that "the state court applied Strickland to the facts of his case in an objectively unreasonable manner." Woodford v. Visciotti, 537 U.S. 19, 25 (2002). This is a formidable burden: "[s]urmounting Strickland's high bar is never an easy task," Padilla v. Kentucky, 559 U.S. 356 (2010), and "[e]stablishing that a state court's application of Strickland was unreasonable under §2254(d) is all the more difficult [because] [t]he standards created by Strickland and §2254(d) are *both* highly deferential, and when the two apply in tandem, review is doubly so." Harrington v. Richter, 562 U.S. 86, 105 (2011) (internal quotation and citation omitted) (emphasis added); see also Cullen v. Pinholster, 563 U.S. 170, 190 (2011) ("review of [state court]'s decision is ... *doubly deferential* [because] [w]e take a highly deferential look at counsel's performance [under Strickland] through the deferential lens of §2254(d)") (internal quotations and citations omitted) (emphasis added). The Strickland standard, the Supreme Court

11

has reminded district courts, is "a general one" and, therefore, the "range of reasonable applications is substantial." Harrington, 562 U.S. at 105. Further, "habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under [section] 2254(d)." Id. The difference is crucial: "[w]hen §2254(d) applies, the question is *not* whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standards." Id. (emphasis added). See also Pinholster, 563 U.S. at 196 (attorney need not state his reasons; rather, the court must "affirmatively entertain the range of possible reasons [ ] counsel may have had for proceeding as [he] did") (internal quotation marks omitted); Greiner v. Wells, 417 F.3d 305, 320 (2d Cir. 2005) (court must "look for legitimate justifications for [counsel's] conduct, including justifications transparent on the record and justifications offered by counsel").

## DISCUSSION

### A. Petitioner's Claims

Under the "doubly deferential" standard of review applied to Strickland claims that the state court has rejected on the merits, Pinholster, 563 U.S. at 190, each branch of petitioner's challenge to the performance of appellate counsel fails to establish a basis for habeas relief.

#### 1. Counsel's Decision to Raise the Inadequate Jury Admonishment Claim

The Appellate Division on *coram nobis* did not unreasonably apply Strickland in concluding that appellate counsel's decision to challenge the adequacy of the trial court's admonishments to the jury falls within "the wide range of professionally competent" strategic choices. Strickland, 466 U.S. at 690. To be sure, as petitioner asserts, the Appellate Division on direct appeal did find the jury admonishment claim to be both unpreserved and meritless. See

People v. Edwards 69 A.D.3d 755, 755 (2d Dep't), lv. app. denied, 15 N.Y.3d 749 (2010) (so holding). But, the Appellate Division recognized that the "admonishments to the jury were less than complete," Edwards, 69 A.D.3d at 755, so the claim was not frivolous. Further, while conceding trial counsel's failure to preserve the issue, appellate counsel argued that admonishment inadequacy should be considered a "mode of proceedings" defect not requiring preservation. See ECF Doc 1, Ex. A at 16.[7]

2. Counsel's Decision Not to Address Sufficiency

In addressing appellate counsel's decision to forego sufficiency altogether, the Court heeds the Supreme Court's recommendation that:

> there is no reason for a court deciding an ineffective assistance claim ... even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. ... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

Strickland, 466 U.S. at 697.

To show Strickland prejudice in the appellate context, as noted above, "petitioner must show that 'there was a reasonable probability that [his] claim would have been successful before the [state's highest court].'" Pignataro, 381 F. App'x at 48 (quoting, Mayo v. Henderson, 13 F.3d 528, 534 (2d Cir. 1994)). And to prevail here, he would have to show that, in rejecting his claim on *coram nobis*, the Appellate Division unreasonably applied either the Strickland prejudice standard or Supreme Court sufficiency holdings when determining that he did not have

---

[7] Because counsel's performance, viewed through the doubly deferential standard of review, was not deficient, there is no need to discuss prejudice. Strickland, 466 U.S. at 697.

13

a "reasonable probability" of prevailing on a sufficiency challenge to either count of conviction. This he cannot do.

### A. Criminal Possession of a Weapon in the Fourth Degree.

Under the applicable New York law, a person commits this crime when he knowingly "possesses... any ... dangerous or deadly instrument with intent to use the same unlawfully against another." PL §265.01(2) (eff. until Nov. 1, 2019). "Dangerous instrument" includes "any instrument, article, or substance...which, under the circumstances in which it is used ... is readily capable of causing death or serious physical injury." PL §10.00(13).[8] Viewing the evidence in the light most favorable to the prosecution,[9] the testimony of Urena was sufficient to support the jury's verdict: it established that petitioner possessed a screwdriver with the intent to use it unlawfully against Urena, and that the tool was readily capable of causing serious physical injury under the circumstances in which it was used. See Hatches v. Heath, 2011 WL 4710854, at *1, 8 (E.D.N.Y. Oct. 4, 2011) (victim's testimony that defendant demanded money while "holding" and "making a jabbing motion with a screwdriver" was sufficient to support fourth-degree weapon possession conviction). In challenging sufficiency, petitioner relies on his own testimony that he was unarmed, and points to features of Urena's testimony that gave the jury a reason to disbelieve it. But Urena's testimony is certainly not "incredible on its face." Peart v. Royce, 2019 WL 3454076, at *6 (N.D.N.Y. July 31, 2019) (treating the "incredible on its face"

---

[8] The court charged the jury similarly, without objection, instructing that a person commits the crime "when that person knowingly possesses a dangerous instrument with intent to use the same against another." T: 1013. The court did not separately define the term "dangerous instrument."

[9] New York applies the federal sufficiency standard. See People v. Conway, 6 N.Y.3d 869, 872 (2006) (applying Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

14

standard as a threshold in sufficiency review). The sufficiency standard, therefore, fully forecloses petitioner's arguments because it requires the Court to assume that the jury credited Urena and drew all reasonable inferences in the state's favor. See Schlup v. Delo, 513 U.S. 298, 330 (1995) ("under Jackson, the assessment of the credibility of witnesses is generally beyond the scope of review").

B. *Assault in the First Degree.*

Under New York law, a person is guilty of this crime when "[w]ith intent to cause serious physical injury to another person, he causes such injury to such person. . . by means of . . . a dangerous instrument." PL §120.10(1). "Serious physical injury" is "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." PL§ 10.00(10). The trial court's charge to the jury, to which petitioner did not object, tracked the statutory language almost verbatim.[10]

Petitioner insists that appellate counsel should have argued that there was insufficient evidence of a serious physical injury.[11] Liberally construing his pro se submissions,[12]

---

[10] The court instructed: "Serious physical injury means impairment of a person's physical condition which creates a substantial risk of death or which causes death or serious and protracted disfigurement or protracted impairment of health or loss or impairment of any bodily function or organ." T: 1010.

[11] Petitioner also argues that counsel should have challenged the "dangerous instrument" element of first degree assault on sufficiency grounds. Because the term has the same meaning in the assault and weapon counts, that branch of petitioner's argument fails for the reasons already discussed.

[12] Pro se filings are to be "construe[d] . . . liberally and interpret[ed] to raise the strongest arguments they suggest." Wright v. Comm'r, 381 F.3d 41, 44 (2d Cir. 2004).

15

petitioner's argument appears to be: first, the injury did not "create a substantial risk of death"; second, Urena did not *lose* his eye; third, there was no "protracted disfigurement" (*i.e.*, Dr. Fishkin testified that there was no damage to the bones around the injured eye); and fourth, notwithstanding the need for two surgeries, there was insufficient evidence of *protracted impairment of the eye; i.e.*, "there was no proof detailing the extent to which the victim's vision had, in fact, worsened as a result of the fight." ECF Doc. 5-1 at 68.

While not frivolous, petitioner's arguments ultimately fail. Crediting the relevant testimony for sufficiency purposes, the Court concludes that it was not unreasonable for the Appellate Division to have concluded that a rational jury could find "serious physical injury" based on, *inter alia*, Dr. Fishkin's account of the eye damage Urena experienced, which speaks for itself, and Urena's testimony that a year after the attack he could see only light out of the eye and would need a third surgery.[13] Further, viewing these facts against the few New York eye damage decisions, it was not unreasonable for the Appellate Division to have concluded that petitioner had no "reasonable probability" of prevailing in the New York Court of Appeals on his sufficiency challenge. See, e.g., People v. Ingram, 95 A.D.3d 1376, 1378 (3d Dep't 2012) (evidence of "serious physical injury" sufficient where victim punched in the eyes with leather-gloved fist suffered dislocated lenses that were surgically removed, had "multiple surgeries," "sustained irreversible optic nerve damage in both eyes" with "particularly severe damage that

---

[13] Trial took place in October 2006; the attack, as noted, occurred in September 2005. The Court further notes that Urena's medical records, which presumably address the state of his eye health at the time of trial, were admitted but are not part of the record furnished by respondent, and Dr. Fishkin was not questioned on that point.

may progress to blindness" in one eye, and "cannot see without thick glasses");[14] People v. Rivera, 41 A.D.3d 1237,1238 (4th Dep't 2007) (evidence that "victim lost a significant amount of blood, suffered petechial hemorrhages in her eyes,[15] underwent surgery on her neck that left a significant and visible scar, and was hospitalized for three days following the surgery" sufficiently established a "serious physical injury" for first-degree assault conviction), lv. app. denied, 10 N.Y.3d 939 (2008).

On the subject of "prejudice," although outside the four corners of the Strickland test, the heart of the matter for petitioner appears to be his belief that a failure of proof on either the "serious physical injury" or "dangerous instrument" element of first-degree assault would reduce the conviction to second-degree assault and liberate him from the persistent violent felony offender designation. See PL § 120.05 (assault in the second degree occurs *either* when a person causes "serious physical injury" *or* when he causes "physical injury" by means of a dangerous instrument or deadly weapon). Although assault in the second degree is a less severe crime, compare PL §70.02(1)(c) (assault in the second degree is a "Class D violent felony offense") with PL§70.02(1)(a) (assault in the first degree a "Class B violent felony offense"), the material point is that *both* are "violent felony offenses" in the statutory definition that triggers the persistent violent felony offender sentencing enhancements. See PL §70.01(1)(a) ("A persistent

---

[14] Ingram involved second-degree assault, but that statute incorporates the same definition of "serious physical injury" used in first-degree assault. See PL §120.05(1), 10.00(10); Ingram, 95 A.D.3d at 1378.

[15] According to medicinenet.com, petechiae are "[p]inpoint flat round red spots under the skin surface caused by ...bleeding into the skin." They "are red because they contain red blood that has leaked from the capillaries into the skin."

violent felony offender is a person who stands convicted of a violent felony offense as defined in subdivision one of section 70.02…after having been previously subjected to two or more violent felony convictions"); 70.02(1)("A violent felony offense is a class B violent felony offense, a class C violent felony offense, a class D violent felony offense…"). In short, petitioner was not prejudiced by appellate counsel's failure to argue sufficiency.

    3.    The Failure to Argue that Trial
           Counsel Was Ineffective

*A. Inadequate Cross-Examination of Dr. Fishkin.*

Noting that Dr. Fishkin testified that Urena's injury was likely caused by an instrument "a few centimeters across," petitioner complains that trial counsel failed to ask the doctor whether a thumb, thumbnail, finger, fingernail, knuckle, or even one of the stems of Urena's eyeglasses was within that size limit and could have caused the eye injury. Petitioner's submission includes several drawings of fists with protruding fingers (the pointer and the thumb) and knuckles to illustrate his injury theories. See ECF Doc. 5-1 at 261-268.

In an affirmation opposing the *coram nobis* application where petitioner raised this claim, appellate counsel notes that Fishkin's testimony was enough to enable trial counsel to argue (as he did) that the injury was caused by petitioner's finger getting past the bone and into the eye. ECF Doc. 5-1 at 295. Counsel further asserts that because of the risk of "unfavorable responses…[i]t is not possible…to rule out the possibility that counsel's cross-examination was limited based on sound strategy." Id.

Given that the heart of petitioner's defense was that he did not have a screwdriver and punched Urena with his fist, it is difficult to understand why none of the questions petitioner identifies was posed on cross-examination. Nevertheless, the doubly deferential standard of

18

review of ineffectiveness claims applies with particular force where the challenged act of counsel is as prototypically "strategic" as the scope of cross-examination. This Court, therefore, cannot say that it was unreasonable for the Appellate Division to have concluded that the decision not to pose the questions was within the wide range of choices deemed strategic.

More pointedly here, however, the Court further rejects this branch of the ineffectiveness claim on prejudice grounds. The case came down to whether the jury believed Urena's version or petitioner's, and petitioner sunk his own ship with his patently incredible insistence that he saw Urena the very next day without a trace of injury. It is inconceivable, therefore, that he was prejudiced by any alleged deficiency in the cross-examination of Dr. Fishkin.

*B. Failure to Call a Rebuttal Eye Expert.*

In a different factual setting, the threadbare nature of counsel's cross-examination of Fishkin might bolster the argument for a defense expert. See, e.g., Harrington v. Richter, 131 S.Ct. 770, 791 (2018) ("Strickland does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense. In many instances cross-examination will be sufficient to expose defects in an expert's presentation."). Here, however, there is nothing a defense ophthalmologist could have done to undermine the most damaging portion of Dr. Fishkin's testimony, which established the severity of the injury, and which was based on his first-hand treatment of Urena rather than expert opinion. The contradictory opinion that the injury could have come from a finger rather than a screwdriver, as already discussed, could easily have been posed to Dr. Fishkin on cross-examination and in any event was argued in summation, arguably a more prudent alternative. Finally, and again most importantly in light of petitioner's own highly damaging testimony, there

could not have been a successful argument that not calling a rebuttal eye expert caused Strickland prejudice.

    C. *Failure to Move to Dismiss the Weapon Count on Sufficiency Grounds.*

  The Court's discussion of petitioner's claim that appellate counsel was ineffective for failing to raise a sufficiency challenge to the weapon count disposes of petitioner's separate claim that appellate counsel was ineffective for failing to argue that trial counsel was ineffective for failing to make that same sufficiency challenge.[16]

## CONCLUSION

  For all the reasons discussed, the application of petitioner Keith Edwards for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied in its entirety. Because petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability will not issue.

SO ORDERED.

Dated: Brooklyn, New York
   September 10, 2019

                      s/ Raymond J Dearie
                      RAYMOND J. DEARIE
                      United States District Judge

---

[16] Petitioner also appears to raise the independent claim that trial counsel was ineffective—for all the reasons asserted in the context of his appellate ineffectiveness claim—and that the cumulative errors of trial counsel deprived him of his right to a fair trial. See Petition at pp. 11-a et seq. But petitioner did not advance these specific assertions in state court. Nevertheless, in the exercise of its authority to *deny* unexhausted claims on the merits, see 28 U.S.C. § 2254(b)(2), the Court would reject these claims as bases for habeas relief for the reasons already discussed in the context of petitioner's appellate ineffectiveness claim.